UNITED STATES of America,

v.

Luis A. MURGAS, a/k/a Big Louie, a/k/a/ Barosa; Luis E. Cordoba–Murgas, a/k/a Negro, a/k/a Carlos; Luis Antonio Todd–Murgas, a/k/a/ Little Louie; Cesar A. Todd–Murgas, a/k/a Tony, a/k/a Pepita; Raul Antonio Cordoba–Murgas, a/k/a Strawberry; Jose C. Dominguez, a/k/a Pachito; Ruben A. Todd–Murgas; Vincente Rogers, a/k/a Santos; Gilberto Arce, a/k/a Luigi Santiago; Jayson Jones; Dennis J. Calandra, Jr.; Tiffany Gaudinot; and Tricia Irving, Defendants.

No. 95–CR–384 HGM.

United States District Court,
N.D. New York.

Jan. 12, 1998.

Thomas J. Maroney, U.S. Atty., Northern District of New York (Grant C. Jaquinth, Asst. U.S. Atty., of counsel), Syracuse, NY.

William D. Walsh, Syracuse, NY, for Cesar A. Todd–Murgas.

Angelo A. Rinaldi, Syracuse, NY, fo Ruben A. Todd–Murgas.

Richard P. Ferris, Utica, NY, for Gilberto Arce.

Stephen Lance Cimino, Syracuse, NY, for Vicente Rogers.

Robert G. Wells, Syracuse, NY, for Raul Antonio Cordoba–Murgas.

## MEMORANDUM–DECISION & ORDER

MUNSON, Senior District Judge.

### BACKGROUND

The court now confronts defendants' motions for judgment of acquittal and for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. On March 21, 1996, the Grand Jury charged the above captioned 13 defendants in an eight count second superseding indictment with engaging in a conspiracy to distribute large quantities of powder and crack cocaine in Rome, New York, and the surrounding Oneida County area. *See* Docket Document Number ("Dkt.No.") 38.

Count I of the indictment charged defendant Raul Antonio Cordoba–Murgas with wilfully failing to deport from the United States in violation of 8 U.S.C. § 1252(e). Count I was later severed by the court on Raul Cordoba–Murgas' motion and is pending resolution. *See* United States' Response to Defendants' Postrial Motions, Dkt. No. 256.

Count II of the indictment charged all defendants with engaging in a conspiracy with intent to distribute and distribution of powder and crack cocaine in violation of 21 U.S.C. § 846. Count III through Count VII charged defendants Vincente Rogers, Ruben A. Todd–Murgas, Gilberto Arce, Cesar A. Todd–Murgas, Luis E. Cordoba–Murgas, and Jayson Jones respectively with "knowingly and intentionally possess[ing] with the intent to distribute and distribut[ing] cocaine" in violation of 21 U.S.C. § 841(a)(1). Lastly, Count VIII asserts forfeitures pursuant to 21 U.S.C. § 853.

Defendants Luis A. Murgas, Luis E. Cordoba–Murgas, Luis Antonio Todd–Murgas, Jayson Jones, Dennis J. Calandra, Jr., Tiffany Gaudinot, and Tricia Irving pled guilty to count II of the indictment prior to trial. Defendant Jose Dominguez remains a fugitive. The remaining five defendants, Cesar A. Todd–Murgas, Raul Antonio Cordoba–Murgas, Ruben A. Todd–Murgas, Vincente Rogers, and Gilberto Arce, proceeded to a jury trial before the court on May 14, 1997.

On June 18, 1997, at the close of the evidence offered by the government, each of the five defendants moved for a judgment of acquittal pursuant to Rule 29(a). *See* Dkt. No. 222. After hearing argument of counsel, the court denied the motions. On June 19, 1997, before the case was submitted to the jury, each of the defendants again moved for a judgment of acquittal pursuant to Rule 29(a). *See* Dkt. No. 223. Again, the court denied defendants' motions.

On June 26, 1997, defendants were found guilty as charged in the indictment and the jury was discharged. Immediately thereafter, defendants advised the court that they wished to file post-trial motions in writing within the time period prescribed by the rules. The court enlarged the time period in which to file the motions to 10 days, as it is authorized to do under Rule 29(c) and Rule 33.

Defendants Vincente Rogers and Gilberto Arce filed post-trial motions on July, 7, 1997. Defendant Cesar Todd–Murgas filed his post-trial motions on July 11, 1997. Defendant Ruben Todd–Murgas filed his post-trial motions on July 28, 1997 and defendant Raul Cordoba–Murgas filed his post-trial motions on July 30, 1997. The government was granted an extension of time and initially responded to the filed motions on July 14, 1997 and supplemented its response on October 1, 1997. As set forth *infra*, the court is without authority to reach the merits of the motions of defendants Ruben Todd–Murgas and Raul Cordoba–Murgas because they are untimely. Having reached the merits of the motions of defendants Cesar Todd–Murgas, Vincente Rogers, and Gilberto Arce, and considering all arguments advanced by defendants and the controlling law, the court denies these motions for the following reasons.

### DISCUSSION

I. *Jurisdiction Pursuant to Rule 29 and Rule 33*

The court first addresses its jurisdiction to entertain defendants' motions for a judgment of acquittal and for a new trial pursuant to

Federal Rules of Criminal Procedure 29 and 33.

Rule 29(c) provides, in pertinent part, that "a motion for judgment of acquittal may by made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period." Fed.R.Crim.Proc. 29(c). A failure on the part of a defendant to file a motion pursuant to Rule 29 within the prescribed time period divests the court of jurisdiction. *See Carlisle v. United States,* 517 U.S. 416, 418–23, 116 S.Ct. 1460, 1463–64, 134 L.Ed.2d 613 (1996); *United States v. Gaydos,* 108 F.3d 505, 512 (3d Cir.1997) ("Since no extension of time was granted, the district court properly determined that it was without jurisdiction to consider the merits of [defendant's] untimely motions for judgment of acquittal" pursuant to Rule 29(c)). Thus, a court lacks authority to consider an untimely filed motion. *See Carlisle,* 517 U.S. at 433–35, 116 S.Ct. at 1470.

■ In the instant case, the jury returned a verdict against defendants on June 26, 1997 and was then discharged. As noted, the court enlarged the time period for filing post-trial motions from seven days to 10 days. This enlargement was granted during the initial seven days after the jury was discharged, as required by Rule 29(c). Thus, excluding weekends and holidays from the 10 day calculation pursuant to Federal Rule of Criminal Procedure 45(a), the time for filing a motion pursuant to Rule 29(c) expired on July 11, 1997.[1] Therefore, defendants Cesar Todd–Murgas, Vincente Rogers, and Gilberto Arce timely filed their motions pursuant to Rule 29 within the mandatory 10 day period. However, defendants Ruben Todd–Murgas and Raul Cordoba–Murgas filed their motions after July 11, 1997 and, thus, beyond the mandatory 10–day period. Accordingly, the court is without authority to consider defendants Ruben Todd–Murgas' and Raul Cordoba–Murgas' Rule 29 motions. *See Car-*

*lisle,* 517 U.S. at 421–23, 116 S.Ct. at 1464 ("the District Court had no authority to grant petitioner's motion for judgment of acquittal filed one day outside the time limit prescribed by Rule 29(c).").

■ Rule 33 compels the same result. A motion for a new trial made pursuant to Rule 33 on any ground other than newly discovered evidence "shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period." Fed.R.Crim.Proc. 33. As with Rule 29, the failure to timely file a motion pursuant to Rule 33 divests the court of jurisdiction to consider the motion. *See United States v. Mayo,* 14 F.3d 128, 132 (2d Cir.1994) ("These time limitations [under Rule 33] are jurisdictional; if the motion is not timely filed, the court lacks power to consider it."); *United States v. Dukes,* 727 F.2d 34, 38 (2d Cir.1984).

In the instant case defendants Cesar Todd–Murgas, Vincente Rogers, and Gilberto Arce timely filed their Rule 33 motions. Ruben Todd–Murgas and Raul Cordoba–Murgas, however, filed their motions beyond the mandatory 10–day period. Accordingly, the court is without jurisdiction to consider the Rule 33 motions of defendants Ruben Todd–Murgas and Raul Cordoba–Murgas. *See, e.g., United States v. Mayo,* 14 F.3d at 132. Thus, there remains for the court's consideration the post-trial motions of Cesar Todd–Murgas, Vincente Rogers, and Gilberto Arce (collectively "defendants").

II. *Standards Pursuant to Rule 29 and Rule 33*

■ Rule 29 provides that a court may set aside a guilty verdict pronounced by a jury and enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. *See* Fed.R.Crim.Proc. 29. When evaluating a motion for judgment of acquittal, the court must determine whether a rational

---

1. At the time the court enlarged the time for filing post-trial motions, defendant Vincente Rogers' counsel sought confirmation of his calculation that the motions should be filed by July 7, 1997. The court confirmed counsel's calculation in open court. This calculation, however, failed to take into account the exclusion of weekends and holidays, as is required under Rule 45(a). Thus, notwithstanding counsel's calculation, as well as the court's confirmation of the calculation, the time to file the post-trial motions pursuant to Rule 29(c) and 33 expired on July 11, 1997, not on July 7, 1997.

jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged. *See, e.g., United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993). The conviction must stand if all the elements of the crime are established beyond a reasonable doubt. *See United States v. Moore,* 54 F.3d 92, 100 (2d Cir.1995).

The burden on the defendant to meet the aforementioned standard is "very heavy." *United States v. Strauss,* 999 F.2d at 696. When evaluating the evidence against a particular defendant, it must be viewed in a light that is most favorable to the government, *see United States v. Moore,* 54 F.3d at 100, and all reasonable inferences must be resolved in favor of the government. *See United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984). The jury may reach its verdict based upon inferences drawn from circumstantial evidence and the evidence must be viewed in conjunction, not in isolation. *See United States v. Moore,* 54 F.3d at 100. The Second Circuit has instructed that "[t]hese strict rules are necessary to avoid judicial usurpation of the jury function" and that the court "should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn from that of the jury." *United States v. Mariani,* 725 F.2d at 865.

Rule 33 motions are governed by a different standard. Pursuant to Rule 33, a trial court is afforded broad discretion to grant a new trial if required in the interest of justice. *See* Fed.R.Crim.Proc. 33; *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). When evaluating a motion for a new trial, "the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *Sanchez,* 969 F.2d at 1413 (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980)). Of course, the court is generally obliged to defer to the jury's resolution as to witness credibility and the weight of the evidence. *See United States v. Casciano,* 927 F.Supp. 54, 57 (N.D.N.Y.1996), *aff'd,* 124 F.3d 106 (2d Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 639, 139 L.Ed.2d 618 (1997). The discretion to award a new trial is not unfettered

and it "is only where exceptional circumstance can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez,* 969 F.2d at 1414. Even the trial court's rejection of all or part of testimony that is incredible does not automatically entitle a defendant to a new trial. *See id.; United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir.1979). "The test is whether 'it would be a manifest injustice to let the guilty verdict stand.'" *Id.* (quoting *United States v. Reed,* 875 F.2d 107, 114 (7th Cir.1989)).

The defendants here were convicted as charged in Count II for engaging in a conspiracy with the intent to distribute powder and crack cocaine pursuant to 21 U.S.C. § 846. In order to sustain a conviction under 21 U.S.C. § 846, the evidence must demonstrate that there existed an agreement or understanding between or among two or more persons to possess cocaine with the intent to distribute it and that a particular defendant knowingly became a member of the conspiracy. *United States v. Martino,* 759 F.2d 998, 1002–04 (2d Cir.1985); *cf.* 21 U.S.C. § 846. "It is the unlawful agreement itself which constitutes the crime." *Martino,* 759 F.2d at 1004.

The elements of the crime of conspiracy and a particular defendant's membership in the conspiracy may be proved entirely by circumstantial evidence. *E.g., United States v. Tutino,* 883 F.2d 1125, 1129 (2d Cir.1989). As the Second Circuit observed, a conspiracy is "by its very nature a secretive operation." *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.1980). Furthermore, the evidence proffered "need not have excluded every possible hypothesis of innocence" to be sufficient to sustain a conviction. *See United States v. Soto,* 716 F.2d 989, 993 (2d Cir.1983).

Defendants also were convicted on Counts III, V, VI, and VII of the indictment which charged the defendants with possession with intent to distribute and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). In order to sustain a conviction under this section, the evidence must demonstrate that defendant knowingly possessed the cocaine with the intent to distribute it or

distributed the cocaine. *See Proyect v. United States,* 101 F.3d 11, 12 (2d Cir.1996); *United States v. Adames,* 901 F.2d 11, 12 (2d Cir.1990); *cf.* 21 U.S.C. § 841(a)(1).

 Having presided over the trial in this matter for more than six weeks, the court is well aware of the extensive evidence introduced against defendants on the conspiracy charge in Count II as well as the substantive charges contained in Counts III, V, VI, and VII. This evidence was comprised of the testimony of approximately 40 government witnesses, including testimony from participants in the conspiracy pursuant to plea agreements and undercover investigators involved in controlled purchases of cocaine with official government funds. The evidence also consisted of the introduction of numerous recordings of intercepted conversations pursuant to court authorized wiretaps involving the coconspirators, and the introduction of cocaine, currency, and drug paraphernalia seized during the execution of search warrants. In addressing these post-trial motions, the court provides a brief summary of the extensive evidence offered against these particular defendants which clearly demonstrates that each defendant knowingly became a member of the conspiracy with the intent to distribute cocaine in violation of 21 U.S.C. § 846 and that each defendant did distribute cocaine in violation of 21 U.S.C. § 841(a)(1). In addition, the court addresses the arguments raised by each defendant in support of these motions. This summary of the evidence and the court's repudiation of defendants' arguments demonstrates that this verdict must stand.

### III. *Summary of the Evidence*

The evidence proffered by the government during trial established that the conspirators engaged in an enterprise to distribute cocaine in the Oneida County area from 1991 to March 1996. The evidence revealed that during the earlier period of the enterprise, Luis A. Murgas ("Luis Murgas") was one of its leaders. For the later part of the enterprise, the evidence revealed that Luis E. Cordoba–Murgas ("Luis Cordoba") was the enterprise's leader.

The enterprise regularly distributed large quantities of cocaine with its larger customers obtaining kilogram weights of cocaine per transaction. Other customers regularly obtained as much as four and one-half ounces of cocaine per transaction. For a period of time the enterprise also distributed crack cocaine.

Luis Murgas testified that upon his arrival in the Oneida County area he began supplying Cesar Todd and other coconspirators with cocaine for distribution. During his testimony, Luis Murgas detailed the amount of cocaine he supplied Cesar Todd for distribution (more than one kilogram) as well as the financial arrangement he had with Cesar Todd for the cocaine supplied.

The evidence revealed that Cesar Todd recruited coconspirator Jayson Jones to transport the cocaine from New York City—the primary geographic source of the cocaine for the enterprise—to the Oneida County area. As Jones testified, he was usually transported to New York City in an automobile by members of the enterprise, which often included Cesar Todd, Vincente Rogers, and Gilberto Arce. After obtaining the cocaine in New York, Jones would return to Oneida County by either bus or train with the cocaine in hand. Jones was routinely paid for his efforts, usually by Cesar Todd or Luis Murgas. In addition to using Jones to transport the cocaine, the enterprise used Jones to store the cocaine. When a distributor in the enterprise needed cocaine for a transaction, the distributor would arrange to obtain it from Jones, usually through a series of coded messages sent to Jones' pager. Jones would regularly distribute the enterprise's cocaine to members of the conspiracy, including Luis Cordoba, Cesar Todd, Vincente Rogers, and Gilberto Arce.

Coconspirator Dennis Calandra testified during the trial that in 1992 he began purchasing cocaine from the conspiracy for personal use and redistribution. During his testimony, Calandra detailed how he primarily obtained cocaine from Cesar Todd, the amounts of cocaine obtained, and the financial arrangements he maintained with Cesar Todd.

Calandra's testimony was credited by the testimony of another customer of the enterprise, Terry O'Conner. O'Connor observed first-hand Cesar Todd delivering cocaine to Calandra. O'Connor also testified about how he obtained cocaine directly from the enterprise through, among others, Cesar Todd and Vincente Rogers and the amount of cocaine he obtained. O'Connor recounted his purchases of cocaine from coconspirator Raul Cordoba–Murgas. On one occasion recounted by O'Connor, O'Connor paged Raul Cordoba–Murgas to obtain cocaine and the page was answered by Cesar Todd, who then delivered the cocaine to O'Connor.

O'Connor's testimony was in turn credited by the testimony of Timothy Purrington, who was often with O'Connor when O'Connor obtained cocaine from, among other conspirators, Cesar Todd and Vincente Rogers.

Shawn Kelly, another major customer of the enterprise who purchased cocaine for redistribution, also testified at the trial. Kelly testified that after he was extradited back to New York from Florida in August 1991 he began buying cocaine from Cesar Todd and other coconspirators for redistribution. Kelly eventually started purchasing as much as a "big eight"—approximately four and one-half ounces of cocaine—every two or three days. Kelly detailed his purchase of a kilogram of cocaine from, among other conspirators, Cesar Todd for an amount of $36,000. One of Kelly's customers, Harold Hopkins, who also testified at the trial, observed Cesar Todd along with other members of the conspiracy deliver varying amounts of cocaine to Kelly. Hopkins, who normally purchased his cocaine from Kelly, testified that he ultimately obtained his cocaine directly from the enterprise through Cesar Todd and other members of the enterprise after Kelly was arrested and incarcerated.

New York State Police Officer Alberto David testified at the trial and recounted an incident when he stopped Cesar Todd and another coconspirator in February 1994 for operating an automobile with excessively tinted windows. After obtaining the appropriate consent to search, Officer David testified that the search uncovered $5,500 in cash on Cesar Todd's person and a total of $10,498 in cash between the two conspirators.

In November 1994, court authorized wiretaps were placed on, among others, the telephones of the enterprise's then-leader, Luis Murgas. The wiretap on Luis Murgas' telephone revealed conversations involving or concerning several of the coconspirators, including Cesar Todd.

Around this time, late 1994, Gilberto Arce arrived in the Oneida County area and, according to the evidence, became an active member in the enterprise. Calandra, who testified that he was obtaining one-eighth to one ounce of cocaine from Cesar Todd about twice a week, also stated that Arce generally accompanied Todd during the deliveries of cocaine.

Also around this time, the evidence demonstrated that Vincente Roger's activities with the enterprise substantially increased. Coconspirator Tiffany Gaudinot, who directed customers to the enterprise, testified that around March 1995 Rogers began supplying her with cocaine on at least a monthly basis. In May of 1995, Rogers moved into Gaudinot's residence and began supplying her with cocaine on almost a daily basis. Gaudinot also obtained, on at least two occasions, cocaine from Arce. Gaudinot testified that she observed Cesar Todd, Vincente Rogers and Gilberto Arce working with "cut"—a substance usually consisting of lactose or inositol that is used to dilute the cocaine—and a large quantity of cocaine. Gaudinot testified that she also observed Rogers and Cesar Todd distributing cocaine to customers of the enterprise. Gaudinot further testified that she observed Luis Cordoba instructing Vincente Rogers as to whom he could distribute cocaine.

New York State Police Investigator Samual Serrano testified regarding, among other things, undercover operations involving the controlled purchase of cocaine from several members of the conspiracy, including Vincente Rogers. The evidence revealed that on July 5, 1995 an undercover investigator purchased 3.49 grams of cocaine from Rogers.

Another customer of the enterprise, Evelyn Kasic Montana, also testified at the trial.

Montana testified that she obtained a cellular phone for Luis Cordoba at the request of Cesar Todd. Montana also observed Cesar Todd and Gilberto Arce, along with ring-leader Luis Cordoba, diluting a large amount of cocaine with cut. After adding the cut to the cocaine, Luis Cordoba departed with the cocaine in his possession. Montana also testified that Cesar Todd supplied her with one-eighth of an ounce of cocaine, delivering it to her at her residence.

In late 1995, court authorized wiretaps were installed on the telephones of several other conspirators. As a result, numerous conversations were intercepted and recorded and then later played for the jury during the trial. These intercepted conversations conclusively linked each of the defendants to the conspiracy.

In one such intercepted conversation, Gilberto Arce called Vincente Rogers from the residence of Michelle Niesiwiecz, someone who was purchasing cocaine for redistribution. Rogers called Arce back and the two discussed making arrangements to get the cocaine from Luis Cordoba. Niesiwiecz, who testified at trial, confirmed the details of that arrangement.

Also intercepted were conversations involving transactions between the enterprise and another of its customers, Linda Waterman. Waterman, who testified for the government at trial, had been obtaining cocaine from the enterprise through coconspirator Luis Murgas prior to his arrest. Subsequent to Murgas' arrest, Waterman called Murgas' pager in an attempt to obtain more cocaine and Vincente Rogers responded to the paged call. Rogers informed Waterman that, inasmuch as Murgas was incarcerated, he was taking over for Murgas. After conversing with Waterman, Rogers reported back to Luis Cordoba, who then directed Rogers, along with Cesar Todd, to meet with Waterman. Thereafter, Waterman obtained her cocaine from the conspiracy through Rogers.

Waterman also testified about a transaction wherein she obtained cocaine from Cesar Todd in the parking lot of a retail auto parts store. This transaction was observed by Rome Police Department Investigator Robert Masucci, who also testified at trial regarding his observations.

Later, in January 1996, Rogers contacted Waterman to determine why she had stopped ordering cocaine from him. Waterman explained to Rogers that she had not ordered cocaine because she had not received her social services check. In response, Rogers offered to "front" her the cocaine until she received her check. In an intercepted phone conversation, Luis Cordoba questioned Rogers' decision to front the cocaine to Waterman. Rogers responded to Cordoba's concerns by informing him that they would test her, saying "we'll wait and see and test her, let's test her."

In an intercepted call on December 30, 1995, Gilberto Arce communicated to another coconspirator how he had missed out on drug sales from the prior night. Arce later referenced making cocaine sales to other customers of the enterprise and made arrangements with Vincente Rogers to obtain cocaine for distribution. Rogers subsequently contacted Luis Cordoba to order the cocaine that Arce requested.

On December 31, 1995, in an intercepted call, ring-leader Luis Cordoba was recorded directing Vincente Rogers to collect money for the sale of cocaine from one of the enterprise's customers, Vincent Ragonese. Luis Cordoba admonished Rogers: "You should have told him what's the joke, to stop fooling around. You got to talk seriously to that guy ... tell him don't make me go to your house." Rogers reported back to Luis Cordoba that Ragonese would pay $390. Cordoba instructed Rogers to take $20 and put the rest away.

The intercepted phone conversations revealed that Rogers and Cesar Todd were advising Luis Cordoba about specific cocaine transactions. In addition, these intercepted conversations revealed Luis Cordoba giving instructions to both Rogers and Cesar Todd regarding the distribution of the cocaine. There were also numerous recorded telephone conversations from Luis Cordoba to Rogers and Cesar Todd regarding collecting money owed to the enterprise.

During another intercepted conversation, in January 1996, Luis Cordoba instructed coconspirator Jason Jones to deliver half of an ounce of cocaine and some cut to Gilberto Arce at Arce's residence. Several hours later, a call was intercepted wherein Luis Cordoba told Arce that "you'll probably start getting some callers, so play lively." Arce responded that "now its clean," apparently meaning he didn't have any more cocaine. Luis Cordoba then informed him to call whenever there was an order. In yet another intercepted phone conversation, Luis Cordoba contacted Jayson Jones about obtaining two ounces of cocaine. Approximately four hours later, Luis Cordoba contacted Gilberto Arce and inquired "do you have it?" to which Arce replied "yes, I have two."

In addition to the intercepted telephone conversations, there was testimony involving other controlled purchases. New York State Police Investigator Figuerido testified at trial regarding his controlled purchase of 4.09 grams of cocaine from Gilberto Arce. This controlled transaction demonstrated the interplay between defendants in the operation of this conspiracy. Kenneth Perry, a known customer of the enterprise, paged Arce and Arce called Perry back to set up the transaction. Luis Cordoba paged Cesar Todd with an encoded message for one-quarter ounce of cocaine and Cesar Todd called back and asked if the cocaine was for Arce. Luis Cordoba confirmed that it was and instructed Cesar Todd to reserve it for him. Arce then met with Investigator Figuerido and Perry to conduct the transaction. New York State Police Investigator Samuel Serrano observed Arce, Investigator Figuerido, and Perry carrying out the transaction.

Two days later on March 7, 1996, Gilberto Arce sold another 3.19 grams of cocaine to Investigator Figuerido. Prior to the sale, there was an intercepted phone call between Cesar Todd and Luis Cordoba regarding Arce obtaining the cocaine from them to distribute to Investigator Figuerido.

On March 5, 1996, Cesar Todd sold 58.76 grams of cocaine to Dennis J. Calandra, Jr. in a controlled purchase with $1100 in official government funds. The day before the sale, Cesar Todd advised Luis Cordoba during a telephone call that was intercepted that he would need cocaine the next day for a transaction. On the afternoon of the sale to Calandra, Luis Cordoba transmitted the order to Jayson Jones via pager and advised Jones that Cesar Todd would pick up the cocaine. Vincente Rogers then called Cesar Todd and advised him to obtain the cocaine "at the weigher's" residence, apparently meaning Jones' residence. New York State Police Investigator Maynard Cosnett observed Jones handing Cesar Todd a package through the window of Cesar Todd's automobile. After the sale was made, Cesar Todd told Luis Cordoba in an intercepted telephone call that he had received $900 for the cocaine, not the $1100 he actually received.

On March 8, 1996, search warrants were executed at the residences of many of the coconspirators. The items seized included $24,850 in United States currency from Luis Cordoba. Among the $24,850 was the $900 of the $1100 in official government funds paid to Cesar Todd for cocaine on March 5, 1996. In addition, among the currency recovered was the $200 paid to Gilberto Arce for cocaine on March 7, 1996. At the residence of Vincente Rogers, officers seized one of the $20 bills paid to Arce for cocaine on March 4, 1996.

The evidence summarized here is clearly sufficient to sustain the conviction of each defendant on both the conspiracy count and the substantive counts. This evidence demonstrates that all of the elements of each count were established beyond a reasonable doubt. Notwithstanding such overwhelming evidence of each of the defendant's guilt, several arguments have been advanced in support of the instant motions. The court will address each argument *seriatim*.

### IV. *Cesar Todd's Motions Pursuant to Rules 29 and 33*

The court need not be detained long by Cesar Todd's motion for judgment of acquittal pursuant to Rule 29. In support of his motion, Cesar Todd did not advance any argument other than the general assertion that "the evidence addressed at trial was insufficient to sustain either conviction" under 21 U.S.C. 841(a)(1) or 21 U.S.C. § 846.

*See* Affidavit of William D. Walsh, Dkt. No. 234. Possibly recognizing the futility of this motion, Cesar Todd failed to submit a memorandum of law in support of this broad-based argument. Thus, the court is left to review the record in search of any basis for Cesar Todd's motion. As set forth, the evidence in support of the guilty verdicts against Cesar Todd is overwhelming and it is clear that a rational jury could conclude beyond a reasonable doubt that Cesar Todd is guilty of the crimes charged. Moreover, the court fails to find any merit to Cesar Todd's contention that the evidence at trial was insufficient to sustain either conviction. Therefore, the court denies Cesar Todd's motion for judgment of acquittal.

Cesar Todd likewise advances no reason why he is entitled to a new trial, and the court fails to find any basis for granting such a motion. Accordingly, the court also denies Cesar Todd's motion for a new trial.

### V. *Vincente Rogers' Motions Pursuant to Rules 29 and 33*

In his motion pursuant to Rule 29, Vincente Rogers asserts that the government failed to meet its burden of proof because the proof only "establishes that [Vincente Rogers] may have been involved in the distribution of small amounts of cocaine, but not as a participant of the charged conspiracy, and with different objectives than those of the charged conspiracy." *See* Memorandum of Law in Support of Vincente Rogers' Post–Trial Motions, Dkt. No. 224, at 4. Rogers further asserts that the testimony of Terry O'Connor, Tiffany Gaudinot, Linda Waterman, Vincent Ragonese, and Jayson Jones, together with the wiretaps, was not sufficient to sustain the convictions against him.

Rogers' assertions are without merit. The evidence established that Rogers was an active and intentional member of the conspiracy and knowingly carried out its objectives. Moreover, the evidence demonstrated that Rogers was involved in nearly every facet of the conspiracy's operations from obtaining the initial source of cocaine from New York City to actually distributing the cocaine and collecting the debts owed the conspiracy by its customers. Additionally, the government proffered evidence that Rogers worked with other members of the conspiracy preparing the cocaine for distribution (*i.e.*, adding cut to the cocaine). Significantly, the evidence demonstrated that Rogers was told to whom he could distribute cocaine to by Louis Cordoba, the ring-leader of the conspiracy. This testimony demonstrates the control that Luis Cordoba, as leader of the enterprise, exerted over Rogers.

The evidence of the sale of cocaine to Michelle Niesiwiecz, who purchased cocaine from the enterprise for redistribution, also helped to demonstrate Rogers' extensive involvement with the conspiracy. In the intercepted calls surrounding that transaction, Gilberto Arce contacted Rogers and the two made arrangements to obtain the cocaine from Luis Cordoba. This transaction demonstrates the concerted effort by Rogers and his coconspirators to distribute the enterprise's cocaine.

There were also the intercepted conversations Rogers had with Linda Waterman. The significance of these conversations was that Waterman was initially paging Luis Murgas, the leader of the enterprise prior to his arrest, to obtain cocaine and Rogers responded to the page informing Waterman that he was taking things over from Luis Murgas because Luis Murgas was incarcerated. Even more significant was that Rogers reported back to Luis Cordoba—who took over from Luis Murgas as ring-leader at around this time—and was then instructed by Luis Cordoba to meet with Waterman regarding her desire to purchase cocaine. Later, when Rogers offered to "front" cocaine to Waterman, his judgment and decision were questioned by Cordoba. These intercepted phone conversations clearly demonstrate Rogers was working in conjunction with the conspiracy, not in isolation distributing cocaine for his own interest as he now contends.

There were also the intercepted telephone calls wherein Louis Cordoba was recorded directing Rogers to collect money owed to the enterprise by Vincent Ragonese. Rogers dutifully reported back to Cordoba the terms of repayment from Ragonese. This recorded

exchange further demonstrates Rogers' connection to the enterprise.

While the court observes that the majority of the intercepted conversations involving cocaine transactions referred to the cocaine in coded or cryptic terms, the significance of the intercepted conversations is not diminished because it could reasonably be concluded that under the circumstances surrounding the conversations the parties were referring to cocaine. These intercepted telephone conversations clearly demonstrate Rogers' extensive involvement with the conspiracy and severely undermine any argument that he was working in isolation to distribute the cocaine for himself. When coupled with the other evidence produced, such as the controlled buy of the cocaine from Rogers, this conclusion is difficult to refute. Thus, the court denies Rogers' Rule 29 motion because it finds that the government produced sufficient evidence from which the jury could have concluded that he was guilty beyond a reasonable doubt on the counts pursuant to 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1).

Turning to the Rule 33 motion, Rogers asserts that he is entitled to a new trial because the court erred in denying his motion for acquittal made at the conclusion of the evidence, the verdict is contrary to the weight of the evidence and is not supported by substantial evidence, the court erred in refusing to grant his motion for a severance, and, finally, in the interest of justice. The court finds none of these arguments sufficient to warrant a new trial and, accordingly, denies Rogers' motion. As set forth, there existed no basis to grant Rogers' motion for a judgment of acquittal at the conclusion of the evidence. Moreover, as also set forth, the verdict is neither contrary to the weight of the evidence nor is it unsupported by the evidence.

 Rogers' argument that the court's decision not to grant him a severance, *see United States v. Murgas*, 967 F.Supp. 695, 710–11 (N.D.N.Y.1997), resulted in a "miscarriage of justice" is without merit. Rogers argues that because he only distributed a small amount of cocaine for personal reasons and not as part of the conspiracy, he was prejudiced by being tried with the other four

defendants. The court rejects Rogers' contention that he played no part in the conspiracy. Thus, there exists no basis for his argument that he suffered a miscarriage of justice in being tried along with his coconspirators, even in light of his alternative argument that he played only a minor role in the conspiracy. *See United States v. Cardascia*, 951 F.2d 474, 482–83 (2d Cir.1991); *United States v. Torres*, 901 F.2d 205, 230 (2d Cir.1990) (a separate trial is not required simply because one defendant's role in a conspiracy is allegedly less significant or peripheral compared to the other conspirators). Accordingly, the court denies Vincente Rogers' motion for a new trial.

### VI. *Gilberto Arce's Motions Pursuant to Rules 29 and 33*

Gilberto Arce asserts that he is entitled to a judgment of acquittal on Count II of the Indictment because the government failed to present sufficient evidence to sustain a conviction under 21 U.S.C. § 846. The basis for Arce's position is that the government failed to show that he conspired with and acted in concert with other members of the alleged conspiracy. To support his position, Arce points to evidence that shows that the pager codes used by him were different than the pager codes used by the conspiracy and, further, that no evidence was introduced showing that he delivered cocaine or collected money for the sale of cocaine.

 Arce's position is untenable. The evidence produced at trial clearly demonstrated that Arce played a major role in the conspiracy and was involved in several facets of its operations, including obtaining the cocaine from New York City, preparing the cocaine for distribution, and distributing the cocaine. Any argument that Arce used different pager codes than the conspiracy is insufficient to rebuff the extensive evidence offered against Arce. Moreover, it is insufficient to demonstrate Arce acted independent of the conspiracy as charged in Count II of the indictment.

There was testimony presented during trial regarding Arce's involvement in the conspiracy. Jayson Jones testified regarding

Arce's involvement in obtaining the cocaine from New York City. Dennis Calandra testified that Arce generally accompanied Cesar Todd during deliveries of cocaine. Coconspirator Tiffany Gaudinot testified that as a customer of the enterprise she obtained cocaine from Arce and observed him working with his coconspirators to add cut to the supply of cocaine. Evelyn Kasic Montana also testified observing Arce and his coconspirators diluting a large amount of cocaine with cut. In addition to this testimony, there was the testimony of police officers involved in controlled purchases from Arce with official government funds, some of which was later recovered from the residence of other coconspirators when the search warrants were executed.

In addition to the direct testimony offered against Arce, there was the evidence of the intercepted telephone conversations which linked Arce to the conspiracy and established his efforts to further its goals. There were numerous intercepted conversations involving Arce and orders for cocaine and cut for the benefit of the conspiracy. For example, in the intercepted conversation involving the sale of cocaine to Michelle Niesiwiecz, Arce was overheard discussing the arrangements with another coconspirator to obtain the cocaine from Luis Cordoba. The January 1996 series of intercepted conversations is another clear example that demonstrated Arce's connection to the conspiracy. In those calls, Louis Cordoba is overheard instructing Jayson Jones to deliver cocaine and cut to Arce at Arce's residence. Several hours later, a call was intercepted wherein Louis Cordoba advised Arce to "play lively" because he would start getting orders for cocaine and that if he needed more cocaine he was to call Cordoba with the orders.

This evidence is sufficient to demonstrate that Arce was heavily involved in furthering the goals of the conspiracy. Accordingly, the court denies Arce's motion for judgment of acquittal based upon his conviction under Count II of the Indictment because the government produced sufficient evidence by which the jury could have concluded beyond a reasonable doubt that he was guilty as charged.

Arce also argues that he is entitled to a judgment of acquittal on his conviction under Counts V and VII of the Indictment pursuant to 21 U.S.C. § 841(a)(1). Arce argues that the government failed to present sufficient evidence to establish Arce's identification as the individual involved in the controlled purchases of cocaine on March 4, 1996 and on March 7, 1996. This argument is based upon alleged inconsistencies in the testimony of the government's witnesses with respect to Arce's identification. The alleged inconsistencies of testimony include the time of the transaction, whether Arce was given the money while he was in the vehicle involved in the transaction, whether the witnesses observed silver on Arce's teeth and whether the conversations were listened to by using a portable telephone or by using a recording device. Arce argues that these inconsistencies, coupled with an initial in-court misidentification of him by Officer Figuerido, indicate that the government presented insufficient evidence on Counts V and VII.

Arce's arguments fail to establish that the government presented insufficient evidence of his guilt. Even assuming there existed minor inconsistencies in the testimony of the government's witnesses, including the initial misidentification which was later corrected with explanation from officer Figuerido, there exists sufficient evidence to allow a jury to conclude beyond a reasonable doubt that Arce was guilty of the charges in the indictment. Moreover, the jury had the opportunity to view the evidence in its totality as well as to determine the credibility of the witnesses. Having done so, the jury concluded that Arce was guilty as charged. The court will not usurp the jury's function in this regard because it finds that each element of the substantive counts was established beyond a reasonable doubt. Accordingly, the court denies Gilberto Arce's motion.

Gilberto Arce moves for a new trial based upon the same grounds asserted in his motion for a judgment of acquittal. Having rejected such grounds as a basis for a judgment of acquittal, the court finds they are equally insufficient grounds to justify the granting of Arce's motion for a new trial. Accordingly, the court denies Arce's motion.

## CONCLUSION

For the foregoing reasons, the court concludes that it is without authority to reach the merits of Ruben Todd–Murgas' and Raul Cordoba–Murgas' motions for judgment of acquittal pursuant to Rule 29(c) and for a new trial pursuant to Rule 33 because they were untimely filed. Having reached the merits of the Rule 29(c) and Rule 33 motions of Cesar Todd–Murgas, Vincente Rogers, and Gilberto Arce, the court denies the motions for the reasons set forth.

The court directs that sentencing for Cesar A. Todd–Murgas, Raul Antonio Cordoba–Murgas, Ruben A. Todd–Murgas, Vincente Rogers, and Gilberto Arce shall commence sometime after April 6, 1998 at the United States Courthouse in Syracuse, New York and defendants and their counsel will be notified as to the date and time of the sentencing of each defendant.

IT IS SO ORDERED.